**Albert Clinton RICHARDS, Petitioner,**

v.

**Nathaniel QUARTERMAN, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent.**

No. 4:07–CV–118–A.

United States District Court, N.D. Texas, Fort Worth Division.

Aug. 27, 2008.

Order Clarifying Decision Sept. 16, 2008.

Danny D. Burns, Law Offices of Danny D. Burns, Fort Worth, TX, for Petitioner.

Susan San Miguel, Tina J. Miranda, Office of the Texas Attorney General, Austin, TX, for Respondent.

*MEMORANDUM OPINION*
*and ORDER*

JOHN McBRYDE, District Judge.

After having considered the petition of Albert Clinton Richards ("Richards") for writ of habeas corpus by a person in state custody pursuant to the authority of 28 U.S.C. § 2254, items filed by the parties in this action subsequent to the filing of the petition, the state court records pertaining to the criminal case against Richards and Richards's state habeas petition, and the record of the hearing conducted in this action on July 21–22, 2008, the court has concluded that Richards's petition should be conditionally granted for the reasons given below.

I.

*Background and Overview*

For procedural background, the court adopts and incorporates here by reference the discussion at pages 1–4 of the Memorandum Opinion and Order the court signed in this action on June 2, 2008 ("June 2 Order"). *Richards v. Quarterman,* No. 4:07–CV–118–A, 2008 WL

2346184 (N.D.Tex. June 2, 2008).[1] As reflected by that discussion, the court concluded that the only ground of Richards's motion that deserved further consideration was his ineffective-assistance-of-counsel ground. The areas of concern the court has about Richards's trial representation were and continue to be as follows: [2]

1. Trial counsel's failure to apprise the jury of the dead man's own descriptions of events preceding his death that significantly varied from the pre-death sequence of events developed by the prosecutor at trial, *id.*, at *2–10;

2. Trial counsel's failure to request a lesser-included offense instruction, *id.*, at *10–11;

3. Trial counsel's failure to put into evidence the rating decision records of the Department of Veterans Affairs pertaining to Richards's physical condition in mid–2002, *id.*, at *11–12; and

4. More generally, trial counsel's failure to properly prepare for trial by interviewing important witnesses in advance of trial, failure to have an organized plan of defense, and failure to conduct Richards's defense in an acceptable manner. *Id.*, at *10–11.

On June 16, 2008, respondent, Nathaniel Quarterman, Director, Texas Department of Criminal Justice, Correctional Institutions Division, filed his response to the concerns expressed by the court in the June 2 Order. On June 23, 2008, Richards, through his court-appointed counsel, Danny D. Burns, amended Richards's petition for relief by abandoning the grounds the court had concluded were without merit, and focusing on Richards's ineffective-assistance-of-counsel ground.

An evidentiary hearing was held July 21–22, 2008. The parties have submitted post-hearing briefs.

## II.

### *The Hearing and Fact–Finding Procedures Pursued in the State Court Habeas Action Were Unacceptable*

Texas law contemplates that an application for writ of habeas corpus by which the applicant seeks relief from a felony judgment imposing a penalty other than death will be directed to the Court of Criminal Appeals of Texas. Tex.Code Crim. P. art. 11.07, §§ 1, 3(a) (Vernon Supp.2008). The processing of the application is handled by the trial court in which the conviction occurred ("state trial court"). *Id.* § 3(b)-(d). After the state trial court has held a hearing, if appropriate, and has made findings of fact pertinent to the grounds of the application, the clerk of that court transmits to the Court of Criminal Appeals the application, other documents filed in the proceeding, transcripts of all hearings, any affidavits, and any other matters used by the state trial court in resolving issues of fact. *Id.* § 3(d). Upon reviewing the record, the Court of Criminal Appeals enters its judgment remanding the applicant to custody or ordering his release, as the law or facts may justify. *Id.* § 5.

The procedure prescribed by Texas law seems reasonable. However, its application to Richards's state habeas application was not. The state trial court purported to have a hearing on Richards's state habeas application and purported to make find-

---

1. The date on which the jury returned its verdict against Richards is incorrectly stated in the June 2 Order to be October 3, 2003. The correct date is October 30, 2003.

2. The court adopts and incorporates here by reference the discussions contained in the June 2 Order explanatory of the court's concerns about the effectiveness of Richards's trial counsel. *Richards v. Quarterman*, No. 4:07–CV–118–A, 2008 WL 2346184, at *2–12 (N.D.Tex. June 2, 2008).

ings of fact, but, as explained below, did neither in a meaningful way.

On December 22, 2005, the State of Texas ("State"), through the office of the Tarrant County Criminal District Attorney ("Prosecutor"), filed its opposition to Richards's state court application. The State alleged that there was a need for the expansion of the record, but that the only expansion needed was an affidavit from Richards's trial counsel, Jill L. Davis; ("Davis") addressing Richards's allegations that he received ineffective assistance of trial counsel. State Habeas R. at 147– unnumbered page. The State concluded its opposition with a prayer that the state trial court order Davis to provide such an affidavit. *Id.* at 148.

On January 3, 2006, the state trial court signed a memorandum and order directing that:

A hearing will be held **by affidavit only** in the above-captioned case concerning Applicant's allegations of ineffective assistance of trial counsel in cause number 0879190D. This hearing will consist of an affidavit from Hon. Jill L. Davis relative to her representation of Applicant in the trial proceedings of this cause and addressing Applicant's specific allegations.

*Id.* at 150. No provision was made for Richards to participate in the "hearing" by affidavit or otherwise. The order specifically directed that Richards "is **NOT** to be brought back to the Tarrant County Jail for this hearing." *Id.*

The affidavit Davis filed February 2, 2006, State Habeas R. at 151–54, was prepared by Davis in consultation with, and with the assistance of, the Prosecutor. Tr. of July 21 Session at 128–29, 131–33; Tr. of July 22 Session at 9–10. A comparison of Davis's handwritten version with the filed affidavit discloses that the statements in the affidavit that are responsive to the grounds of Richards's state court applica-

tion concerning the adequacy of Davis's representation of Richards were added to the text of Davis's initial draft after Davis conferred with the Prosecutor. Pet'r Ex. 11; State Habeas R. at 151–54. The explanations given in the affidavit for Davis's questioned conduct in the representation of Richards were in important respects merely conclusory, without explanation, and could not provide a basis for informed findings of fact.

On October 27, 2006, the State, acting through the Prosecutor, filed in the state trial court its proposed memorandum, findings of fact, and conclusions of law. *Id.* at 278–91. As proposed findings of fact related to the questioned conduct of Davis, the State, for all practical purposes, simply-parroted the statements on those subjects contained in Davis's affidavit. *Id.* at 283, ¶¶ 49, 55, 56, 59, & 60; at 284, ¶ 63. Six days later, on November 2, 2006, the state trial court issued an order stating that it "adopts the State's Memorandum, Findings of Fact, and Conclusions of Law as its own, and recommends that relief requested by Albert Clinton Richards ("Applicant") be **DENIED**." *Id.* at 293. The clerk of that court was directed to file "these findings and transmit them along with a Writ Transcript to the Clerk of the Court of Criminal Appeals as required by law." *Id.* On January 31, 2007, a judge of the Court of Criminal Appeals signed a one-sentence order advising that the "ACTION TAKEN" was "DENIED WITHOUT WRITTEN ORDER ON FINDINGS OF TRIAL COURT WITHOUT HEARING." *Id.* at 2d p. (unnumbered page behind cover sheet).

It might be charitable to describe the steps leading to the denial of Richards's state application as a series of charades. The conduct of the state trial court in complying with the State's suggestion that the only expansion of the record needed was an affidavit from Davis, and ordering

that a hearing would be granted *by way of affidavit only from Davis,* was an absurd pretense that Richards was being given a hearing on his application. No provision having been made for Richards to have a role in the "hearing," the degree of fairness and objectivity of the proceeding deteriorated from there.

"[A] federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts." *Townsend v. Sain,* 372 U.S. 293, 312–13, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Here, the state trial court did not reliably find the relevant facts after a full hearing. The principles of *Townsend* must now be considered in the light of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which has a specific provision, codified as 28 U.S.C. § 2254(e)(2),[3] governing when a federal court can hold an evidentiary hearing on a claim made in a petition under 28 U.S.C. § 2254.

■ Section 2254(e)(2)'s restriction on the grant of a hearing applies only if "the applicant has failed to develop the factual basis of a claim in State court proceedings." *McDonald v. Johnson,* 139 F.3d 1056, 1059 (5th Cir.1998) (quoting 28 U.S.C. § 2254(e)(2)). A "petitioner cannot be said to have failed to develop a factual basis for his claim unless the undeveloped

record is a result of his own decision or omission." *Id.* (quotation marks omitted). The need to develop a record in this action on Richards's ineffective-assistance-of-counsel claim was not the result of Richards's own decision or omission.

Therefore, in determining to have a hearing, the court was guided by the *Townsend* principles and Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts, which provides that "[i]f the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." *See McDonald v. Johnson,* 139 F.3d at 1060; *see also* RANDY HERTZ & JAMES L. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 20.1b 892 (5th ed.2001).

## III.

*This Court is Not Bound by the Findings and Adjudications of the State Court on the Ineffective–Assistance–of–Counsel Ground*

The ability of this court to make determinations supplementing or at variance with the findings and adjudications made by the state court is controlled by an application of 28 U.S.C. § 2254(d).[4] The court

---

**3.** Title 28 U.S.C. § 2254(e)(2) reads:

(e)(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional

error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

**4.** Title 28 U.S.C. § 2254(d) reads:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

has concluded that the state court's rejection of Richards's ineffective-assistance-of-counsel ground was based on unreasonable determinations of the facts in the light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(2). The affidavit of Davis, which was the only thing on which the state court could rely for its findings concerning Davis's justifications for her pretrial and trial conduct, was not adequate to form the basis for informed findings on those subjects. The record of Richards's criminal trial is sufficient to raise concerns about Davis's conduct, but is devoid of anything that would acquit her.

Moreover, the rulings of the state court denying Richards's ineffective-assistance-of-counsel ground involve unreasonable applications of clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). "The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). And, "[t]he focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable . . . ." *Id.* While the state court correctly identified principles adopted by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), it unreasonably applied them to the facts of this particular case. *See Perez v. Cain,* 529 F.3d 588, 594 (5th Cir.2008). *See also*

*Harrison v. Quarterman,* 496 F.3d 419, 424 (5th Cir.2007) (stating that "[a] decision constitutes an 'unreasonable application' of clearly established federal law if it is 'objectively unreasonable.'"). In this case, the determinations of the state court as to Richards's ineffective-assistance-of-counsel ground were objectively unreasonable under the state court record.

Any presumption of correctness of determinations made by the state court relevant to Richards's ineffective-assistance-of-counsel ground has been rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).[5]

## IV.

### Observations Concerning Credibility of Witnesses

The witnesses who testified at the July 21–22, 2008, hearing were Tiffany Burks ("Burks"), one of the prosecutors at Richards's criminal trial; Davis; Richards; and Deborah Cauffman ("Cauffman"), a non-lawyer legal assistant employed by Davis. The court has made the following credibility evaluations, in a general way, as to the witnesses:

#### Burks.

The court has no reason to question the credibility of Burks. Unfortunately, she had very little memory of events relevant to Richards's ineffective-assistance-of-counsel claim, but, as the court will note, she made certain points that are probative. *Infra* at 31 n. 15, 36 n. 17.

---

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

**5.** Title 28 U.S.C. § 2254(e)(1) reads as follows:

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

*Davis.*

After having heard Davis's testimony and compared it with the documentary evidence, and having observed her demeanor on the witness stand, the court has serious concerns about the credibility of Davis. Examples of reasons for those concerns are discussed below.

(a) As part of her attempt to define a trial strategy that would explain her conduct in preventing, by way of hearsay objections, the prosecutor from developing at Richards's trial exculpatory testimony concerning statements the alleged victim, Cullen Baker, ("Baker") made after his injury concerning the circumstances of his injury, Davis testified that until mid-trial (when Richards's brother testified that Richards told him that he had hit Baker with a rock) Richards consistently had maintained that he had not hit Baker. She testified that:

> THE COURT: Your client had never indicated to you before his brother testified at trial, your client before that had never indicated to you that he did hit Mr. Baker?
>
> THE WITNESS: Not only not indicated, he was adamant that he did not. That he did not.

Tr. of July 21 Session at 51. At another point in the hearing, Davis testified that it was shocking when Richards admitted to her at the counsel table that he had hit Baker. Tr. of July 22 Session at 27. She added that she based her trial strategy on statements Richards told her "over and over" that he had not hit Baker. *Id.* at 28.

A handwritten note contained in a file folder Davis had with her when she came to the courthouse to testify [6] suggests that her testimony was false. The note reads in its entirety as follows:

> Has offer of 5 on murder—
>
> "Fight on Thurs. I passed out come to he was coming after me—*hit him with rock*—(Ron Watkins also had problems with dead man) Found dead on Sunday—Gets $625 a month disability—
>
> Try get bond reduced. Motion for speedy trail [sic]—
>
> No court date—

Pet'r Ex. 11, note on yellow paper on right side of file folder (emphasis added).[7] Obviously this note records what Richards told Davis in advance of trial.[8]

Also, there is evidence in Petitioner's Exhibit 11 of Davis's deception when she testified that she did not know until mid-trial that Richards's brother would say that Richards told him that Richards struck Baker. Tr. of July 21 Session at 49–51. Inside the cover of Petitioner's Exhibit 11 is a form titled "CLIENT INFORMATION SHEET." It was filled out for the most part by Richards's brother when he hired Davis. *Id.* at 43. The handwriting in the "CASE DETAILS" section appears to be the handwriting of Karen Casey, who was Davis's legal assistant at that time. *Id.* Part of that entry is marked through. Davis said that she cannot tell what words were marked through. *Id.* at 44. Upon close study, the words can be made out. When they are included in

---

6. A fair inference is that Davis did not anticipate that the court or Richards's counsel would see the file folder. She did not bring it to the witness stand with her, and it became an exhibit at the court's initiative when she retrieved it to determine the date when she started representing Richards. Tr. of July 21 Session at 32–33, 38–40.

7. The contents of the note suggest that it was probably written about the time Davis replaced Richards's court-appointed attorney.

8. About ten or fifteen minutes before the trial started Richards discussed with Davis that the rock he hit Baker with was big enough to fit in the palm of his hand. Tr. of July 21 Session at 90–91.

the "CASE DETAILS" entry, the entry reads as follows:

Homeless guy—victim white guy
—he's a truck driver; has a CDL he was out on a binge, in a tent, the I.P. hit him
—w/a stick, *Albert hit him w/a rock.*

Pet'r Ex. 11 at inside of front cover. The underlined part is the part that is marked through.

The contents of the record make clear, and the court finds, that Davis knew in advance of trial that Richards struck Baker with a rock. And, she knew from the outset that Richards told his brother that Richards hit Baker with a rock.[9]

(b) Davis gave testimony, and made statements in her affidavit, indicating that she had several visits with Richards while he was in jail. *Id.* at 134. In contrast, Richards testified that Davis came to see him in jail only one time before the day the jury was picked, and that visit was for her to learn how to get her money. *Id.* at 86. The record tends to substantiate Richards's version. The file folder Davis brought to the hearing contains a letter dated July 2, 2003, from Richards to Davis that suggests that she was not appropriately communicating with him. Pet'r Ex. 11, handwritten letter dated July 2, 2003. Payment of Davis's fee by Richards's brother is a significant topic in the letter. On the back page of the State's list of witnesses (showing a date of service of October 27, 2003) contained in the trial notebook that was identified by Cauffman as Davis's, there is a handwritten note saying "ROGER PLEASE RELEASE $2,000 TO JILL DAVIS PLEASE." Resp't Ex. 3 at 23A. Davis testified that this note probably was written by Richards when she saw him in jail. Tr. of July 22 Session at 35–37.

(c) Another example is found in the evidence pertaining to existence and availability of the file material Davis said she created in her preparation for, and participation in, Richards's criminal trial. Counsel for Richards tried without success on more than one occasion in advance of the hearing to discuss with Davis, or at least review, her file pertaining to her representation of Richards. Tr. of July 21 Session at 105–06. When Davis appeared as a witness, she produced the file folder mentioned above that contained very limited information concerning Richards's criminal case. Tr. of July 21 Session at 32–33, 37–40; Pet'r Ex. 11. Davis testified that during the trial she made notes on a legal pad. Tr. of July 21 Session at 143. She agreed during an overnight recess to try to locate her trial notes. *Id.* at 143–44. The following day she reported that she had not been able to find them. Tr. of July 22 Session at 5.

---

9. Davis sought to give credibility to her false testimony by maintaining that during a discussion she had with Burks in the courtroom hallway, Burks told her that her recollection is that she and her fellow prosecutor at Richards's trial, Michelle Hartman, first knew that the brother would testify that Richards told him he had hit Baker was when he said so from the witness stand. Tr. of July 22 Session at 37. The record of the trial does not bear out those assertions:

Q. Did your brother tell you whether or not he had injured this man that was found dead in the tent?

MS. DAVIS: I'm going to object to hearsay.
THE COURT: Overruled.
Q. You can answer the question.
A. He told me in self-defense.
Q. What did he tell he had done?
A. He said the guy hit him with a stick and he tried to get him off of him and hit him with a rock.

Trial Tr., Vol. 3 at 82. Hartman presumably knew what the answer would be when she asked the question. The fact that Davis objected to the question confirms that she, notwithstanding her sworn testimony to the contrary, also knew what the answer would be.

In Davis's state habeas affidavit she said that she and her investigator went to the area where the altercation occurred and "met many men who were familiar with Albert and the deceased" and "wrote down the names of the men [they] interviewed." State Habeas R. at 151. But, when asked to produce everything she had pertaining to Richards's case, she did not produce any handwritten notes made by her or her investigator pertaining to any actual or potential witnesses.

When Cauffman appeared to testify, she failed to bring any file material. Just before the lunch recess on July 21 Cauffman testified that she thought the file material would be back at the office and that she would try to locate it during the recess. Tr. of July 21 Session at 97–98. When Cauffman returned from the recess, she brought with her two trial notebooks containing material pertaining to Richards's case. Id. at 101. She said that she found them in the office of a lawyer who practices with Davis. One of the notebooks, Respondent's Exhibit 3, is the trial notebook Davis used, and the other, Respondent's Exhibit 4, is the one Cauffman used. Id. at 102. The notebooks did not contain any witness information other than information that the State had given either Davis or the attorney she replaced or any notations pertaining to the trial itself.

At a later point in the hearing, when asked if there was a possibility that other file material could be found, Davis responded that she was satisfied that she could not find it. Id. at 94. But, none of the items marked as exhibits contained the kind of notations, such as notes of witnesses' names and addresses and reports of witness interviews,[10] that normally would be contained in a file pertaining to trial preparation of a criminal case.

Davis's testimony as to the existence or whereabouts of items of that kind was puzzling. In one breath she indicated notes of identities of witnesses and witness information were made, and in another she indicated that they were not—at least were not maintained as part of her file. Davis said that her investigator talked to different witnesses, and made notes when he did so, but never provided notes or copies thereof to her. Id. at 136–38. At one point she indicated that she probably threw handwritten notes pertaining to identities of potential witnesses away as the pretrial investigation progressed. Id. at 139–40.

The court concludes that the file material that finally was produced represents everything created by Davis and those working with her as part of their trial preparation and that the foot-dragging over producing all of the material at the hearing had as its goal preventing the court from seeing that Davis's trial preparation material did not include the things that would have been included if Davis had properly prepared for trial.

(d) Another matter of concern is that Davis made statements in the habeas affidavit that were contrary to the testimony she gave at the hearing and/or statements she made on the record at the criminal trial. For instance, she said in her affidavit that the state witnesses were not made available to the defense, thus rendering it nearly impossible to interview them before the day of trial, but that she did speak to them before their testimony in the witness area of the courthouse. State Habeas R. at 152–53. The record of the trial itself establishes that last part of that statement is untrue. The trial record affirmatively shows that Davis had not visited at all with

---

10. The notebooks did contain witness statements, but only those that had been furnished to Davis or her predecessor by the prosecutor.

important witnesses Oakley, Brown, and Quails before they took the witness stand. *See Richards,* 2008 WL 2346184, at \*10; Trial Tr., Vol. 3 at 26–27; Vol. 4 at 100, 150. Davis had no memory of whether her investigator made contact with Brown or Quails in advance of Richards's trial. Tr. of July 22 Session at 50–51.

\*    \*    \*    \*    \*    \*

The court's overall impression of Davis's testimony is that she was doing what she could to assist the State in defeating her former client's habeas petition, even if it meant being less than candid. To the extent any findings and conclusions the court expresses in this memorandum opinion and order are at variance with testimony Davis gave at that hearing, the variance is because the court is unwilling to accept as accurate the testimony of Davis.

*Cauffman.*

The court has much the same concerns about the testimony of Cauffman that the court has with Davis's testimony. The court's impression is that Cauffman joined Davis in doing what she could to assist the court in defeating the habeas petition, aligning her testimony with Davis's in areas where the court believes that Davis was less than candid. Findings and conclusions of the court in this memorandum opinion and order at variance with Cauffman's testimony do not overlook her testimony but reflect the court's unwillingness to accept it because of credibility concerns.

*Richards.*

As the record of the hearing reflects, the court had, and expressed, a great deal of concern with Richards's testimony that Davis had advised him the day they picked the jury not to testify, that he agreed with her, and that "all of sudden, out of the blue, she called [him] to testify with no warning, no nothing." Tr. of July 21 Session at 86. As the court noted, the record of the criminal trial seems to contradict that testimony. Trial Tr., Vol. 4 at 165–67.

Upon further study, the court is not so certain Richards intentionally misrepresented what happened. It is likely that Richards did not understand Davis's intentions from time to time and that his answers to the questions she posed to him before he testified at trial may have been somewhat misleading.

Davis knew that in order to establish a self-defense theory, she would have to put Richards on the stand:

Q. How were you going to prove up self-defense in this case?

A. Well, I mean, once I knew I had to, once I knew that we had to have that— Well, I mean, because he was telling me that it was—Once he admitted he did indeed hit him, but I hit him in self-defense, then we had to develop that strategy immediately.

And he told me that it was because—I mean, he told me how that happened out there on the Slab, and I was going to prove it up by, you know, him—*he was going to have to testify. He was going to have to say what happened....*

Tr. of July 22 Session at 30 (emphasis added). The court finds that, notwithstanding Davis's testimony to the contrary, Davis was pursuing a self-defense theory, albeit a poorly defined one, from the beginning of the trial, and intended from the very outset of the trial to put Richards on the witness stand.

The court hesitates to speculate on what Davis had in mind when she had Richards testify at his trial that it was with reluctance on her part that she was calling him to the stand, Trial Tr., Vol. 4 at 165–67; however, the court concludes that the exchange was not for the benefit of Richards, and that it was designed to serve some undisclosed goal of Davis's.

On other subjects about which Richards testified, the court had the impression that Richards was telling the truth. The court

has not overlooked Richards's post-trial letter to Davis (contained in Petitioner's Exhibit 11) that shows that Richards was convinced during and at the end of trial that Davis was providing him good trial representation. However, the court does not credit Richards with having had the knowledge as his criminal trial approached and developed that would be required to evaluate the adequacy of that representation.

## V.

*Further Discussion of the Features of Richards's Ineffective–Assistance–of–Counsel Ground About Which the Court Has Concern*

The discussions under this heading supplement the discussions on the same subjects that are found in the June 2 Order. *Richards,* 2008 WL 2346184, at *2–12.

The legal principles by which the court is guided in making its findings and reaching its conclusion on Richards's ineffective-assistance-of-counsel claim are those now firmly established by Supreme Court law. In order to prevail on an ineffective-assistance-of-counsel ground, Richards must show (1) that his counsel's performance fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. 2052. "A reasonable probability is a probability-sufficient to undermine the confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 697, 104 S.Ct. 2052.

To establish the first prong, Richards must overcome a strong presumption that his counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689, 104 S.Ct. 2052. Judicial scrutiny of counsel's conduct must be highly deferential, with every effort made to avoid the distorting effects of hindsight. *Id.* at 689–90, 104 S.Ct. 2052. It is not enough to show that some, or even most, defense lawyers would have handled the case differently. *Green v. Lynaugh,* 868 F.2d 176, 178 (5th Cir.1989). For the second prong, Richards must show that his counsel's errors were so serious as to "deprive [him] of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.[11]

The court now turns to a discussion of each of the aspects of the ineffective-assistance-of-counsel ground that the court has concluded has merit.

A. *Trial Counsel's Failure to Apprise the Jury of the Dead Man's Own Descriptions of Events Preceding His Death That Significantly Varied from the Pre-death Sequence of Events Developed by the Prosecutor at Trial.*

■ In her state court affidavit Davis inaccurately represented that she "presented any and all exculpatory evidence available to [her]." State Habeas R. at 153. The fact is that she did not present important exculpatory evidence in the form of statements made by Baker before his death concerning the events that led to his death. Had she presented that evidence, or allowed it to be presented, the jury would have heard evidence that di-

---

11. If Richards cannot show that the ineffectiveness of his counsel deprived him of a substantive or procedural right to which the law entitles him, then he must show that the result of the proceeding was fundamentally unfair or unreliable. *Williams v. Taylor,* 529 U.S. 362, 391–93, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (discussing *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), and *Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986)).

rectly contradicted the testimony the jury heard from persons who said they were eye witnesses to an assault by Richards on Baker that the State claimed caused Baker's death.[12] The jury would have known that Baker told two people that a person by the name of Ron was the principal assailant. Through that exculpatory evidence, Davis could have made plausible arguments that, even though Richards hit Baker, others also hit him, and that the conduct of the others occurred sometime after the altercation between Richards and Baker and led to Baker's death. Those arguments would have been consistent with a self-defense theory and an alternative contention that, at most, Richards was guilty of an assault offense.

Apparently recognizing the significance of Davis's failure to present this exculpatory evidence, or even to allow it to be presented when the prosecutor attempted to do so, Davis strived at the July 21–22 hearing to create the appearance of a strategic reason why she kept the exculpatory evidence from the jury. In the process, Davis has engaged in what might best be described as legal prestidigitation.

As previously noted, at the July 21–22 hearing Davis took the positions that she learned mid-trial that Richards and his brother would establish that Richards hit Baker with a rock. *Supra* at 855–56. She testified that before then she had not given thought to asserting the theory of self-defense. Tr. of July 21 Session at 52. Davis said that until then her defense theory was the "mob theory."[13] *Id.* However, the record reflects that Davis's contention that the prospect of asserting a self-defense theory did not occur to Davis until mid-trial is but an afterthought. The "mob theory" strategy contention is based on a false premise and is disputed by other parts of the record.

The voir dire examination that led to the selection of the jury at Richards's trial shows that both sides understood during jury selection that self-defense was an issue that would be presented by the evidence in the case. After the prosecutor questioned the jury panel on that subject, State Trial R., Vol. II at 34–39, Davis devoted significant attention to her self-defense theory during her questioning, *id.* at 83–87.[14] In addition, Davis asked voir

---

**12.** In his post-hearing memorandum respondent seems to take the position that in evaluating the adequacy of Davis's representation of Richards, and the effect of inadequacies in the representation she provided, the court must assume that witnesses Brown and Quails testified truthfully at Richards's trial, Resp't Post–Hr'g Mem. at 22. Respondent misses the point that Brown and Quails could well have testified falsely, and that the importance of the jury hearing the exculpatory evidence was so that the jury would have information that would assist it in the evaluation of what the prosecution presented as eye witness testimony.

**13.** Davis explained:
Q. You were going to put Albert on the stand, were you not, to raise the self-defense claim?
A. The self-defense claim didn't come up until his brother blurted that out. We had to change—The defensive theory was that

multiple people could have done this and the finger pointing was going on, but when his brother blurted out—or spoke that Albert had told him that he had hit him, we had to come up with a self-defense theory from that point.
THE COURT: What was your theory up until then?
THE WITNESS: I call it—I mean, these are just my layman's terms, "the mob theory," that anybody associated around in this group could have been the one that did it. That's just what we call it. I mean, me, personally, "mob theory."
Tr. of July 21 Session at 52. She gave slightly different versions of her trial strategy at other points in her testimony. *See id.* at 63–64; Tr. of July 22 Session at 19–20, 27–28.

**14.** Counsel for respondent developed through Davis at the hearing the following somewhat nonsensical explanation as to why Davis ques-

dire questions that apparently anticipated evidence that Richards struck the deceased but that after he did so another person or other persons caused the injury to Baker that led to his death. *Id.* at 87–90.

Consistent with the self-defense strategy that Davis apparently had in mind when participating in jury selection, Davis explained in the affidavit she filed in opposition to Richards's state habeas application that her defense strategy was as follows:

> Our defense was that the man became aggressive with Albert, and, therefore, it was self-defense. Albert took the stand and told the jury he acted in self-defense.

State Habeas R. at 152. No mention is made in Davis's affidavit of her ever having pursued, or entertained, a "mob theory" strategy.

When the State responded on June 16, 2008, to the June 2 Order (in which the court expressed concern with Davis's conduct in preventing the jury from having knowledge of things Baker said following his injury), the State repeatedly told the court that Davis's reason for objecting to the admission of the statements made by Baker was to preserve Richards's claim of self-defense. Resp. at 7–15. Resp. at 11 (where the State said that Davis was not unreasonable in proceeding to trial with a self-defense theory). Bearing in mind the Rule 11 certifications and representations counsel for the State made when they signed and filed the State's response (that

the factual contentions stated in it had evidentiary support, Fed.R.Civ.P. 11(a) & (b)(3)), the court must assume that counsel for the State discussed with Davis her defense strategy before they prepared the response, and that the response accurately relates what she told them.

Not until Davis was called as a witness on July 21 in this habeas action did she make any mention that she at any point in the trial was pursuing a "mob theory" strategy that did not at the same time involve a theory of self-defense or that the possibility of pursuing a self-defense theory did not occur to her until mid-trial when, according to her, Richards's brother surprised her by testifying that Richards told him that he had struck Baker. The court finds that Davis's testimony that she at one time had a "mob theory" strategy that did not include a self-defense element is false. The record makes apparent that Davis started out the trial with an ill-defined self-defense strategy, and continued to have that strategy to some degree or another throughout the trial, but lost focus from time to time as to what her trial strategy really was.[15]

The record establishes that, in fact, Davis had no trial strategy that played a role in her decision to prevent the jury from learning what Baker said after he was injured concerning the circumstances of his injury. Telling are the following exchanges between the court and Davis:

> THE COURT: Did it ever occur to you that you had a reasonable argument

tioned the jury panel about the self-defense theory:

> Q.... Why did you voir dire, then, on self-defense if that wasn't your strategy from the beginning?
> A. I was a little surprised that the state, you know, voir dired on it because that would have meant that, you know, they knew I would have to put Albert on or someone to raise that. And I never want—
> Since they touched on it, I never want them

to have the only word on a topic, such as self-defense. I felt compelled to talk about it in some fashion, so that I, you know, I would have the last spin, or whatever, my definition, the way I phrase things differently, you know, from the state.

Tr. of July 22 Session at 21–22.

**15.** So ambiguous was Davis's trial strategy that her opponent, Burks, never understood what it was. Tr. of July 21 Session at 16.

if you had allowed the evidence in that your client hit Mr. Baker and that sometime after your client hit him, other people hit him?

THE WITNESS: Do I think I had—

THE COURT: Did it ever occur to you that that might be something worth developing during the trial?

THE WITNESS: *I don't remember if it occurred to me or not.* I knew what my theory was, and *I don't remember if I considered that one as an alternative or not.*

. . . .

THE COURT: Once it became apparent that there was going to be evidence that your client hit Mr. Baker, wasn't it important then to develop the possibility that other people could have hit him after your client hit him?

THE WITNESS: *That would be important.*

THE COURT: *Why didn't you develop it?*

THE WITNESS: I don't—*I don't remember.*

Tr. of July 21 Session at 63–64 (emphasis added).

THE COURT: And once it was established that your client did hit Mr. Baker, then it was extremely important to establish the time element of when things happened, wasn't it?

THE WITNESS: After it was learned by me—after I learned that Albert had indeed hit him, then I had to think quickly.

THE COURT: Well, it was important at that point in time to establish the time element.

THE WITNESS: The time element? *I don't remember if that occurred to me.* I mean, I see what you're saying, and I don't—I mean, I don't know if I can say I know that now and I knew that then. *I don't remember. I can see that that is important.*

*Id.* at 77–78 (emphasis added).

THE COURT: Why didn't you ask your client what time of day it was that he hit Mr. Baker with whatever he said he hit him with?

THE WITNESS: When he was on the witness stand?

THE COURT: Yes.

THE WITNESS: *I don't remember why I didn't.*

THE COURT: Okay. *That was kind of important, wasn't it?*

THE WITNESS: *You know, I don't remember—I don't remember what I was thinking then. I don't. I just don't.*

*Id.* at 75–76 (emphasis added).

What Richards would have said if he had been asked at his trial to give the time of day when his altercation with Baker happened would have been important.[16] Richards testified at the July 21–22 hearing that the altercation occurred at 10:00 or 10:30 p.m. on February 13. Tr. of July 21 Session at 92. He said that he had informed Davis of that fact several times before he was put on the stand to testify. *Id.* at 90–92. In a letter Richards sent

---

**16.** Respondent argues in its post-hearing memorandum that the court cannot consider in this habeas action the matter of the time of day when the Richards/Baker altercation occurred for the reason that the timeliness issue is unexhausted and, therefore, procedurally defaulted. Resp't Post–Hr'g Mem. at 13–16. Respondent overlooks that the timing issue is an essential ingredient of the complaint by Richards that Davis did not offer available exculpatory evidence. To whatever extent timeliness was not specifically mentioned in Richards's state court habeas application, it nevertheless would be appropriate for consideration by this court as being merely supplemental to his state court ground. *See Morris v. Dretke,* 413 F.3d 484, 486 (5th Cir.2005).

Davis a few days after the trial concluded, he reminded her that "I told you in the hold over cell the fight happened about 10:00 to 10:30 p.m. . . . ." Pet'r Ex. 11, handwritten letter from Richards to Jill Davis & Co.

The court finds that if Davis had questioned Richards on the timing of his fight with Baker, Richards's answer would have provided basis for a plausible argument to the jury that enough time elapsed between the Baker/Richards altercation and Baker's arrival at the Thomas residence at 3:00 to 3:30 a.m. on February 14 for another person to assault Baker after the Richards–Baker altercation, inflicting the injury that led to Baker's death. And, if Davis had not prevented the jury from hearing the testimony of Oakley, Thomas, and Fornier about what Baker told them after his injury, there would have been persuasive evidence that such a thing occurred. However, Davis seemed to fail to fully understand the potential for successful pursuit of that line of defense. For example, with reference to what Baker told Fornier the morning of February 14, 2003, about the identity of the person who assaulted him, and the circumstances of the assault, Davis testified:

Q. Okay. Now, in the trial notebook, . . . I believe it's the Exhibit 3 notebook is a statement of Michael Fornier.

A. Yes, sir.

Q. I take it you had read that before the trial?

A. Yes, sir.

Q. Okay. And he had identified the person who everybody, I think, understands is Ron as being the person that Mr. Baker told him the morning of February 14th was the person who had assaulted him?

A. Correct. I mean, he says that.

. . . .

Q. Would that have fit into any of your theories, your mob theory or your self-defense theory?

A. The mob theory that he would have—and I believe I mentioned it, I tossed it out there in—but I think we had already switched to self-defense at that time, if I'm not mistaken, but that helped me with other people being potentially an attacker.

. . . .

Q. How about the possibility that somebody hit him after Albert hit him and did the fatal damage?

A. That could have been. That could have been.

Q. Mr. Fornier's testimony would have supported such a theory, wouldn't it?

A. Assuming he didn't say anything about it being like days before or something.

Q. Okay. But my question really is: *Is there any strategical reason why you wouldn't have used Mr. Fornier's statement as to what Mr. Baker told him?*

A. *Not off the top of my head. I'd have to really think about it.* There's always something that you worry that comes up.

Tr. of July 22 Session at 38–40 (emphasis added).

The court finds that the conduct of Davis that prevented the jury from learning of the statements Baker made to Oakley, Thomas, and Fornier after he suffered his injury concerning the circumstances that led to his injury was not the result of any trial strategy or reasoned decision of Davis.[17] Her conduct fell below an objec-

---

17. Of interest on the subject under discussion is testimony of Burks that, if one were to assume that Davis had a reasonable trial strategy, she would have been surprised at the steps Davis took to prevent the jury from hearing the testimony of the witnesses who visited with Baker after he was injured. Tr.

tive standard of reasonableness, and was outside even the widest range of reasonable professional assistance. Davis's conduct amounted to ineffective assistance of counsel that permeated Richards's entire trial. In making these findings, the court has been highly deferential in its evaluation of Davis's trial conduct, and has made every effort to avoid the distorting effects of hindsight. The strong presumption that Davis's conduct falls within the wide range of reasonable professional assistance has been overcome by the record in this action.

The court has concluded, and finds, that there is a reasonable probability that, but for the unprofessional conduct of Davis in preventing the jury from hearing through Oakley, Thomas, and Fornier what Baker said following his injury, the result of Richards's trial would have been different-Davis's error in this regard was sufficient to undermine the confidence in Richards's trial. *See Richards*, 2008 WL 2346184, at *10. Davis's deficient performance prejudiced Richards's defense. There is a reasonable probability that the jury would not have convicted Richards of murder if there had been a full disclosure to the jury of the exculpatory evidence under discussion. The absence of such a full disclosure caused Richards's murder conviction to be fundamentally unfair and unreliable.

B. *Trial Counsel's Failure to Request a Lesser–Included Offense Instruction.*

■ Under Texas law, the offense of aggravated assault occurs if (1) a person intentionally, knowingly, or recklessly causes serious bodily injury to another or (2) uses a deadly weapon when intentionally, knowingly, or recklessly causing bodily injury to another. Tex. Penal Code §§ 22.02(a), 22.01(a)(1) (Vernon 2003). Such an offense is a felony of the second degree, *id.* § 22.02(b), punishable by imprisonment for a term of not more than twenty years or less than two years, *id.* § 12.33(a).

The murder offense for which Richards was convicted is a felony of the first degree, *id.* § 19.02(c), for which the punishment can range from life to a term of five years, *id.* § 12.32. Richards was sentenced to a term of twenty-five years based on the jury's verdict that he was guilty of murder.

■ Richards complains that Davis provided him ineffective assistance of counsel by not asking the state trial judge to include in his instructions to the jury an instruction that would have permitted the jury to find Richards guilty of aggravated assault as an alternative to finding him guilty of murder.

The state trial court would have committed error in failing to give the jury a lesser-included offense instruction on aggravated assault if Davis had requested it. *See Lawson v. State*, 775 S.W.2d 495, 500 (Tex.App.-Austin 1989, pet. ref'd) (holding that the failure of the trial court to include a requested lesser-included charge on aggravated assault in its charge to the jury in a murder case was error and resulted in harm to the defendant). In *Lawson*, the court described the two factors that require submission of a lesser-included offense charge if requested:

First, the lesser included offense must be included in the proof necessary to establish the charged offense. Second, there must be some evidence that if

of July 21 Session at 27–28. Burks noted that she asked each of the witnesses who had exculpatory evidence to tell what Baker said, and that in each instance the question was not answered because the court sustained Davis's objection to the question. *Id.* at 27.

Burks cannot say for sure what she had in mind when she sought to develop that evidence, but her normal practice would be to put evidence harmful to the prosecution's case out in front of the jury at the outset to attempt to draw the sting. *Id.*

defendant is guilty, he is guilty only of the lesser offense.

*Id.* at 499 (citation omitted).

The elements that had to be established for the jury to find Richards guilty of murder were, as defined in the state court's charge to the jury, as follows:

[I]f you believe from the evidence beyond a reasonable doubt, that the defendant, Albert Clinton Richards, on or about the 16th day of February 2003, in Tarrant County, Texas, did then and there intentionally with the intent to cause serious bodily injury to Cullen Baker, commit an act clearly dangerous to human life, namely, hitting him with a deadly weapon, to-wit: a rock, or a brick, or a piece of concrete asphalt, that in the manner of its use or intended use was capable of causing death or serious bodily injury, which caused the death of Cullen Baker, you will find the defendant guilty of the offense of murder as alleged in the indictment.

State Habeas R. at 98.

Richards has satisfied the first *Lawson* factor two different ways. The proof the state was required to make to convict Richards of murder included evidence (1) that Richards intentionally caused serious bodily injury to Baker and (2) that Richards used a deadly weapon when intentionally causing bodily injury to Baker. A finding of either (1) or (2) would establish the offense of aggravated assault. Richards has satisfied the second factor as well. As to the "deadly weapon" feature of the aggravated assault offense, the evidence would support findings by the jury that, while Richards might have used a deadly weapon that caused bodily injury to Baker, he did not intentionally do so with the intent to cause serious bodily injury to Baker. Also, there was evidence that Richards did not commit an act clearly dangerous to human life that caused the death of Baker. Richards's testimony es-

tablishes that his assault on Baker had as its sole purpose preventing Baker from causing further harm to Richards. The jury could have concluded from the evidence that, while Richards hit Baker with a rock, he did not commit an "act clearly dangerous to human life," as defined in the state court's instruction to the jury.

The statement by Davis in her state habeas affidavit that she "did not request a lesser included ... based on [her] belief that the request[ ] ... would have been frivolous," State Habeas R. at 152, not only is itself frivolous, but bears out what was apparent from Davis's testimony at the hearing that she does not understand the lesser-included offense concept. Her testimony on this subject included the following:

Q. So if the evidence is raised, even though it's minimal or really minute, and whether it comes through cross-examination or direct evidence, whatever, of the elements of a lesser included, that would make them an issue that could be presented to the jury, does it not?

A. It could be, yes.

Q. So it wouldn't be frivolous to ask for the lesser included offenses, would it?

A. If the evidence sufficiently raises it.

Q. And the evidence does raise it, whether it's your theory or not, it did raise those lesser included offenses, did it not?

A. I did not believe it did, no.

Q. *What element do you believe was missing from, first of all, aggravated assault with a deadly weapon?*

A. *Well, I don't believe that he committed an offense that he was criminally responsible for.*

Q. What element of aggravated assault—

THE COURT: Wait a minute. I didn't understand that.

THE WITNESS: *I didn't believe* that he was—*that his behavior was that of*

*which he could be held criminally responsible.*

THE COURT: Because of self-defense?

THE WITNESS: Correct.

THE COURT: So it was an all or nothing proposition, as far as you were concerned.

THE WITNESS: Correct. *And I didn't want the jury to have two chances to convict him.*

THE COURT: *For a lesser offense?*

THE WITNESS: *Correct.*

THE COURT: Okay. Go ahead.

THE WITNESS: *I call it two bites at the apple, but I didn't want them to have that.*

THE COURT: You didn't want them to have that option?

THE WITNESS: I didn't. *I didn't believe that they had presented enough for murder.* I believed we had enough for beyond a reasonable doubt for murder, but I didn't want them to have an opportunity to convict him of something else. So that was a deliberate move on my part to not ask for it.

Tr. of July 21 Session at 55–57 (emphasis added).

Q. So if you consciously decided not to do it because you wanted all or nothing, do you agree that the lesser included offenses—requesting the lesser included offenses wouldn't have been frivolous. It may not have been in line with your trial strategy, but it wouldn't have been frivolous.

A. Well, what I mean "frivolous" is *I didn't believe at that time that the evidence had sufficiently raised it.*

THE COURT: *You didn't think the government had?*

THE WITNESS: *I didn't.*

THE COURT: *I mean, the state.*

THE WITNESS: *I didn't.* I didn't believe Judge Gill would give it to us.

THE COURT: In other words, *the way you looked at it, if the state didn't raise the elements of aggravated assault, then it would not be appropriate to ask for the lesser included offense?*

THE WITNESS: *Correct.* I didn't believe that the evidence sufficiently raised it, and even if it had I really believed that it was better that they only have the murder charge because I didn't think that the state had proven that, that we would have a not guilty on the murder.

THE COURT: Well, if the state hadn't proven aggravated assault, then that would lead you to believe there wasn't any evidence that would support a murder conviction, wouldn't it?

THE WITNESS: Right.

THE COURT: Did you move for a— What is it in state court when there's no evidence?

MR. BURNS: Directed verdict, Your Honor, of not guilty.

THE COURT: Did you move for such a verdict?

THE WITNESS: I don't remember if I did. I usually do, but, I mean, just even if—I mean, they're so rarely granted, but I don't remember if I did or not. I would have to look at it.

*Id.* at 57–58 (emphasis added).[18]

Davis's testimony establishes that she lacks an appreciation for the use of a less-

---

**18.** Davis did not request a directed verdict of not guilty when the State rested, Trial Tr., Vol. 4 at 163–68, or at the conclusion of the evidence, id. at 224. Davis said in her state habeas affidavit that she did not request an instructed verdict based on her belief that the request would have been frivolous. State Habeas R. at 152. Her assertion that the making of such a request would have been frivolous shows her lack of understanding of the procedural rules appropriate to be followed if the defense attorney does not believe that

er-included offense instruction as insurance for a defendant when the evidence raises the issue of commission of the charged more serious offense as well as the lesser offense. *See Beck v. Alabama,* 447 U.S. 625, 637, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); *Keeble v. United States,* 412 U.S. 205, 212–13, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973). Her belief that a lesser-included instruction is not authorized unless the State raises the elements of the lesser offense shows a serious misunderstanding of the Texas law that such an instruction is required, upon request, if *any of the evidence* raises the elements of the lesser offense. *Lawson,* 775 S.W.2d at 499 (saying "[a] charge on the lesser-included offense must be given if evidence *from any source* raises an issue that a lesser-included offense might have been committed.").

When an attorney for respondent attempted to rehabilitate Davis on the subject of why she did not request an aggravated assault instruction to the jury, Davis's explanation became even less coherent:

Q. Is there anything you would like to clarify in the affidavit?

A. Yes. I believe that in light of our strategy going into trial, that he never touched him, never hit him—you know, that was our strategy before trial. That asking for aggravated assault would have been frivolous. And then even when it changed to self-defense—and that's what we were hanging our hat on. And I did throw in, in closing, and I think with Dr. Sisler some, perhaps, alternative ways that he could have died, exposure, et cetera, that asking for aggravated assault, again, would have been frivolous and not part of what my strategy was.

Tr. of July 22 Session at 8–9.

A fair inference from the hearing testimony is that Davis never discussed with Richards the possibility of requesting a lesser-included offense instruction. Tr. of July 21 Session at 89.

There is no rational reason why Davis would not have requested a lesser-included instruction on aggravated assault. The failure to request it was not the result of any trial strategy or reasoned decision. Indeed, the court is satisfied, and finds, that it never occurred to Davis to request such an instruction. Davis's conduct in failing to request such an instruction fell below an objective standard of reasonableness, and was outside even the widest range of reasonable professional assistance. Again, the court has been highly deferential in its evaluation of Davis's conduct, and has made every effort to avoid the distorting effects of hindsight. The presumption that Davis's conduct in failing to request a lesser-included instruction on aggravated assault was within the wide range of reasonable professional assistance has been overcome by the record in this action.

There is a reasonable probability that, but for the unprofessional conduct of Davis in not requesting a lesser-included instruction, the result of Richards's trial would have been different—Davis's error was sufficient to undermine the confidence in Richards's trial. Because of Davis's error, the jury finding of murder against Richards was fundamentally unfair and unreasonable. There is a probability that the jury would not have convicted Richards of murder if it had been given the option of

there is evidence to support a conviction. *See Todd v. State,* 242 S.W.3d 126, 136 (Tex.App.-Texarkana 2007, pet. ref'd) (explaining that "[a] motion for a directed verdict of acquittal is a challenge to the legal sufficiency of the evidence; if such a challenge is sustained, it results in the immediate dismissal of the charges against the accused.").

convicting him of aggravated assault. Because Texas law requires the giving of a lesser included instruction if supported by the evidence, there is a presumption that the state court would have given a lesser-included instruction on aggravated assault if it had been requested.

C. *Trial Counsel's Failure to Put Into Evidence the Rating Decision Records of the Department of Veterans Affairs Pertaining to Richards's Physical Condition in Mid–2002.*

■ The discussion under this heading supplements the discussion on the same subject in the June 2 Order. *Richards,* 2008 WL 2346184, at *11–12. There is no question but that the Veterans Administration medical records would have been beneficial to Richards's defense. They would have provided documentation for arguments Davis made that Richards had physical limitations that should be taken into account in determining the issue of innocence/guilt and, later, the issue of punishment.

In Davis's state habeas affidavit she dismissed her neglect to put the records into evidence with the assertion that "I could not present a medical records 'alibi' with clear conscious [sic] based on my duty as a lawyer." State Habeas R. at 153. When called upon at the July 21–22 hearing to explain why she did not put the medical records into evidence, she resorted to gibberish. Tr. of July 21 Session at 81–84. She started with the following explanations:

THE COURT: And you read my reference to some records from the Veteran's Administration?

THE WITNESS: Yes, sir.

THE COURT: Did you ever see those records?

THE WITNESS: Yes, sir.

THE COURT: When did you see them?

THE WITNESS: I don't remember. I mean, they looked—I don't remember when it was. The reason I know that is because on the one hand we wanted—I mean, Albert wanted to show that he wasn't physically strong enough to have committed this, and that was when our theory was going to be, you know, that he didn't have anything. There was no contact made with the deceased. But then when we went to self-defense mid-trial, then I can't have him being feeble. I needed him to be strong enough to do it. You know, I didn't believe we could have it both ways.

THE COURT: You didn't think you could have him strong enough to hit him once with a brick but not strong enough to pound on him eight times? You didn't think it was important to—

THE WITNESS: I didn't want—I did not want—I needed him to be strong enough to, you know, to fight with Mr. Baker. I needed him to be strong enough to do that. So I didn't want to run the risk that the jury would say, well, on the one hand he's feeble and has bad, you know, bad medical conditions, but on the other hand, he's strong enough, you know, to do this. Plus, I had to take into consideration that they had been doing—I knew the testimony was about crack.

THE COURT: During the trial you argued that his medical condition was such that he was unlikely to do what he was accused of doing.

THE WITNESS: The eight or nine times, or to the extent that some of the other witnesses—

THE COURT: You made that argument.

THE WITNESS: Okay.

THE COURT: Wouldn't it have been important to have medical records to back that argument up?

THE WITNESS: I mean, now, I mean—I mean, I chose not to, so … *Id.* at 81–82.

When asked why she made the conscious decision not to back up her representation to the jury that Richards did not have the physical ability to do what he was accused of doing, Davis responded that she was concerned that records of disciplinary problems Richards had while in jail would come in.[19] *Id.* at 83. She clarified that she was talking about "[t]he jail records for fighting and for having scuffles." *Id.* at 84. Davis's testimony overlooked that the only information she had during Richards's trial of any inappropriate conduct of Richards while in jail was notice that he used profanity on May 30, 2003, toward Lettie Thomas while in Tarrant County jail. Tr. of July 22 Session at 29–30; Resp't Ex. 3 at 36.

In his post-hearing memorandum respondent repeats Davis's assertion that she was justified in not offering the medical records because if she had done so it would have opened the door for the admission of Richards's jail records that showed that Richards had been fighting. Resp't Post–Hr'g Mem. at 21. As did Davis, respondent fails to acknowledge that when Davis made her decision the only jail activity that had been brought to her attention was Richards's use of profanity on one occasion.

In fact, if the jail records to which respondent refers had been brought to the attention of the jury, Richards would have come out ahead because they would have added to the medical proof that Richards had serious medical problems that were physically limiting. Joint Ex. 1 at 179–80, 186–87, 196. The one fight to which reference is made in the jail records commenced when another inmate attacked Richards, who then responded with his fists. *Id.* at 182. That was the fight that resulted in the change in housing assignment to which respondent refers in its memorandum. *Id.* at 181. The only other mention made in the jail records pertaining to anything remotely resembling an altercation is a record of an inmate complaining that another inmate had been threatening Richards and yet another inmate. *Id.* at 190–91.

The jail records do not provide credible reason for Davis not offering into evidence the Veterans Administration medical records; and, the court finds that Davis's reference to jail records was an after-the-fact justification for her failure to perform properly as an attorney and that things shown in the jail records played no part in her failure to offer the medical records at trial.

The conduct of Davis in failing to put before the state court and jury the Veterans Administration medical records of Richards deprived the state court and jury of important information that would have benefitted Richards at the punishment phase as well as at the innocence/guilt phase of his trial. When the state court invited the defense to proceed at the punishment stage, Davis announced, "Judge, at this time we have no witnesses call [sic], no evidence to put on in punishment." Trial Tr., Vol. 6 at 2. Davis then was invited to make a summation on the matter of punishment, in response to which she made a seven-sentence statement, the entire text of which was as follows:

> We would urge the Court to consider that his prior is UUMV which you have before you that he did admit to on the stand. He is on disability from his open-heart surgery. He is an ex-ma-

---

19. Davis gave no explanation as to why she did not have a concern that the records of disciplinary problems would come in in re-sponse to the questions she asked Richards about his physical infirmity.

rine. He has at some point had a normal life. He testified about his years as a truck driver. He didn't always live on the street.

His addiction to crack has ruined everything he ever had that was normal, and we would ask that the Court consider a lower sentence in light of his health problems and the fact that he has at one time exhibit normalcy as a productive citizen, and given an opportunity at some point in the future to come back to society and give that another chance. *Id.* at 3. If Davis had caused the Veterans Administration medical records to be put into evidence, she would have had concrete proof for the judge to consider at the punishment phase that, indeed, Richards was a Vietnam War veteran, having served in the marines, and that he had serious medical problems that caused him to be totally disabled for all practical purposes.

The failure of Davis to offer those records into evidence was not the result of any trial strategy or any reasoned decision on her part. She did not make a conscious decision on that subject. Her conduct in that regard fell below an objective standard of reasonableness. The court in making the findings and conclusions expressed under this heading has been highly deferential in its evaluation of Davis's trial conduct, and has made every effort to avoid the distorting effects of hindsight. The presumption that Davis's conduct in failing to put the medical records into evidence falls within the wide range of reasonable professional assistance has been overcome by the record in this action.

Davis's deficient performance prejudiced Richards's defense by denying him important documentation that would back up his contention that he had physical limitations that were inconsistent with the testimony of the eye witnesses upon whom the prosecution relied concerning the alleged activities of Richards in assaulting Baker. If the medical records had been put into evidence, Richards's prospect of obtaining a non-guilty verdict based on his self-defense theory would have been enhanced, and the judge at the sentencing stage would have had reliable evidence that he could have taken into account in determining the sentence to impose. Had the medical records been available, and appropriately presented, to the trial judge at sentencing, the judge undoubtedly would have taken the contents of the records into account and probably would have imposed a sentence of imprisonment lower than the one he imposed.

### D. More Generally, Trial Counsel's Failure to Properly Prepare for Trial by Interviewing Important Witnesses in Advance of Trial, Failure to Have an Organized Plan of Defense, and Failure to Conduct Richards's Defense in an Acceptable Manner.

This aspect of Richards's ineffective-assistance-of-counsel ground embraces all the aspects previously discussed in subsections A, B, and C of this section V as well as the other deficient performance of Davis in her trial preparation and the conduct of the trial. There is no excuse for Davis's failure to interview in advance of trial the important witnesses Oakley, Brown, and Quails. Davis's failure to interview those witnesses in advance of trial rises to the level of constitutionally deficient performance. *See Anderson v. Johnson,* 338 F.3d 382, 392 (5th Cir.2003). Nor is there any excuse for not interviewing important witnesses Thomas and Fornier in advance of the trial date. In each instance, her interviews of the latter two witnesses were outside the courtroom shortly before they took the stand. Tr. of July 21 Session at 47; Trial Tr., Vol. 3 at 62 (where she started her questioning of Fornier with the statement "[y]ou and I

had a moment to visit a little bit ago out in the hall").

Davis's questioning of witnesses was inadequate. At trial, Davis obtained second-hand information from witness S.J. Waters ("Waters"), who was the detective responsible for the investigation of Baker's death, that Baker identified Ron Watkins was "one of the guys," but Davis immediately cancelled that bit of information out by developing through Waters the hearsay testimony that Watkins had stated that he had nothing to do with it and was not present at the time. Trial Tr., Vol. 4 at 37. There is no rational reason why Davis would cause to be put in the record Watkins's denial of involvement. The testimony was hearsay, and could not be put in the record by the prosecutor. It did not benefit Richards. Instead, it was to his detriment, because it diluted the impact of the testimony of Waters about what Fornier told her. As already noted, if Davis had not prevented by her hearsay objection to the prosecutor's question asking Fornier what Baker said, there would have been testimony before the jury that, while pointing toward Watkins, Baker told Fornier "that is the man right there that beat me last night." *Richards*, 2008 WL 2346184, at *9.

Had Davis given deserved significance of the possibility of a time lapse between the Baker/Richards altercation and the appearance by the injured Baker at the Thomas residence at 3:00–3:30 a.m. on February 14, Davis would have used in her cross-examination of Quails the statement he made to Detective Waters that the Baker/Richards altercation occurred "about 1 or 2 in the morning." Resp't Ex. 4 at 45. As it was, Davis was left without anything to use as an evidentiary basis for an argument to the jury that enough time elapsed between the Baker/Richards altercation and the appearance of Baker at the Thomas residence to permit another person or other persons to be the assailant or assailants of Baker who caused the injury that resulted in his death. Even without the testimony that she prevented Oakley, Thomas, and Fornier from giving, there was enough in the trial record to provide a plausible argument on that subject if there had been evidence of at time lapse.

Because of her apparent lack of a sense of direction in her trial defense of Richards, Davis did virtually nothing in her cross-examination of the alleged eye witnesses, Brown and Quails, to discredit their testimony, and she provided no meaningful argument on that subject. One of the areas of discrepancy between the versions of Brown and Quails that Davis overlooked was the time of day when the Baker/Richards altercation occurred. Brown said it was at 2:30 or 3:00 a.m. on February 14. Trial Tr., Vol. 4 at 93. Quails was not asked to give the time of day. If he had been asked, presumably he would have said that it happened at about 1:00 or 2:00 a.m., as he did in his written statement to Detective Waters. Resp't Ex. 4 at 45. If he said otherwise, he would have been subject to impeachment. Davis did nothing to take advantage of this discrepancy between the versions of the two witnesses.

Another discrepancy between the versions given by Brown and Quails was what happened after the altercation they described. Brown's testimony was ambiguous. He said that after the altercation ended he and Richards had words and then they all left. Trial Tr., Vol. 4 at 92. Then he, apparently based on what he had learned after the fact, said that he thought Baker had fled to a man's house who has a little green car to use the phone. *Id.* at 93. On cross-examination by Davis, she led Brown into repeating that Baker "took off running down the road" and went to someone's house that had a green car. *Id.*

at 125. In contrast, Quails testified that after the altercation ended he and Brown "took off" and they "left Albert and Mr. Cullen there talking." *Id.* at 146. Obviously, one of the witnesses did not have a good memory or was giving false testimony. Davis did not utilize this discrepancy in any respect. If, as Quails testified, Richards and Baker were left visiting with each other, Richards must not have had an intent to do serious harm to Baker; and, something must have happened thereafter that led to Baker's appearance at the Thomas residence at 3:00–3:30 a.m. At least, reasonable arguments of that kind could have been made on the basis of the record as it existed, but were not made by Davis. Of course, the arguments would have had better evidentiary support if Davis had not prevented the jury from hearing what Baker told Oakley, Thomas, and Fornier later in the morning on February 14 or if she had asked Richards to say when his altercation with Baker occurred.

The lack of a defined strategy by Davis is further illustrated by her summation to the jury, during which she flitted from one subject to another with very little cohesiveness between any of them. *Id.* at 230–40.

The cumulative effect of Davis's deficiencies in the representation of Richards amounted to ineffective assistance of counsel that permeated Richards's entire trial. Her overall conduct fell below an objective standard of reasonableness, and was outside the wide range of reasonable professional assistance. The strong presumption that Davis's overall trial conduct falls within the wide range of reasonable professional assistance has been overcome by the record in this action. Her overall deficient conduct in the representation of Richards caused his murder conviction to be fundamentally unfair and unreliable. The court has concluded, and finds, that there is a reasonable probability that, but for the unprofessional conduct of Davis in the representation of Richards, the result of his trial would have been different. Her errors were sufficient to undermine the confidence in Richards's trial. There is a reasonable probability that the jury would not have convicted Richards of murder if Davis had conducted his defense in an acceptable manner.

## VI.

### Conclusion

As the Supreme Court explained in *Strickland:*

> The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.
>
> For that reason, the Court has recognized that the right to counsel is the right to the effective assistance of counsel.

466 U.S. at 685–86, 104 S.Ct. 2052 (quotation marks omitted). Counsel "can also deprive a defendant of the right to effective assistance, simply by failing to render adequate legal assistance . . . ." *Id.* at 686, 104 S.Ct. 2052 (quotation marks omitted).

For the reasons given above, Davis deprived Richards of his right to effective assistance by her failure to render adequate legal assistance to him. Davis failed to play the role necessary to ensure that Richards's trial was fair. She failed to play the role that is critical to the ability of the adversarial system to produce just results. Therefore, the court is conditionally granting Richards's application for writ of habeas corpus. The jury's verdict, the state court judge's pronouncement of pun-

ishment, and the judgment dated October 30, 2003, in the state court criminal case against Richards are being vacated. The court is ordering that within ninety days of the date of the signing of this order the State either to retry Richards or dismiss with prejudice the indictment pursuant to which he was tried. Also, the court is requiring the State to notify Richards and this court of its intention within thirty days of the date of the signing of this order.

Richards has now been in custody since February 2003, approximately five-and-one-half years. This undoubtedly is a longer period of custody than Richards would have served if he had been convicted of the offense of aggravated assault. It is about five years longer than he would have been in custody if he had been acquitted, as he probably would have been if he had been properly represented at trial. Therefore, the court expects the State promptly to take steps to cause Richards to be released from custody on appropriate conditions of release that will not impose a financial burden on him. The court is directing the State to notify Richards and the court of its intentions relative to release within twenty days of the date of the signing of this order.

The court reserves the right to make further rulings in reference to Richards's custody, depending on the level of compliance by the State with the directives of this order.

## VII.

### ORDER

The court ORDERS that Richards's application for habeas corpus be, and is hereby, conditionally granted.

The court further ORDERS that the jury's verdict, the state court judge's pronouncement of punishment, and the judgment dated October 30, 2003, in the state court criminal case against Richards be, and are hereby, vacated.

The court further ORDERS that within ninety days of the date of the signing of this order the State either retry Richards or dismiss with prejudice the indictment pursuant to which Richards was tried.

The court further ORDERS that within thirty days from the signing of this order the State notify Richards and this court of its intention relative to retrial versus dismissal.

The court further ORDERS that the State promptly take steps to cause Richards to be released from custody on appropriate conditions of release that will not impose a financial burden on him, and that the State notify Richards and the court of its intentions relative to the conditions of release within twenty days of the date of the signing of this order.

### ORDER ON MOTION TO ALTER OF AMEND

After having considered the motion of respondent, Nathaniel Quarterman, Director, Texas Department of Criminal Justice, Correctional Institutions Division, to alter or amend pursuant to Rule 59(e), filed September 11, 2008, and the response of petitioner, Albert Clinton Richards, ("Richards") thereto, filed September 15, 2008, the court has concluded that clarification of the part of the order to which the motion is directed would be appropriate because of the apparent misunderstanding relative to the possibility of pretrial release of Richards on conditions of release. The part of the August 27, 2008, memorandum opinion and order that requires clarification is as follows:

> The court further ORDERS that the State promptly take steps to cause Richards to be released from custody on appropriate conditions of release that will not impose a financial burden on him, and that the State notify Richards and the court of its intentions relative to

the conditions of release within twenty days of the date of the signing of this order.

Aug. 27, 2008, Mem. Op. & Order at 61–62. The court does not intend to impose on the State an obligation to cause Richards to be released from custody on pretrial conditions of release fixed by the State. Rather, the court intended to convey that, if the State fails to notify the court within twenty days of the signing of the order that it will cause Richards to be released on conditions of release fixed by the State, the court would consider ordering Richards's release on conditions of release fixed by the court, consistent with the broad power given the court by 28 U.S.C. § 2243 (which provides that after determining the facts related to a request for a writ of habeas corpus, the court shall "dispose of the matter as law and justice require").[1]

On the date of the signing of this order, the court received from respondent a document notifying the court of the State's intent to retry Richards. Presumably the retrial will be within ninety days from August 27, 2008, as contemplated by the August 27, 2008, memorandum opinion and order. Also, the document respondent filed on this date indicates that the State does not propose to release Richards on conditions of release fixed by it. That being so, the court will consider ordering the pretrial release of Richards subject to conditions of release fixed by the court. The court adds that it does not agree with the suggestion made by respondent in its September 16 filing that if the court orders such a release "the State is free to treat Richards as any other indicted person, taking him into custody and then follow its normal procedures of imposing or denying bail pending his retrial." Sept. 16, 2008, Resp. at 2. The court anticipates that, if it orders Richards released on pretrial conditions of release, the State will not take him into custody unless and until he is convicted upon a retrial or is authorized by this court to do so.

Bearing in mind the State's interest in having Richards available and present for retrial, the court is soliciting from the State any suggestions it might have relative to conditions that should be included in conditions of release to be fixed by this court, bearing in mind the thought of the court that the conditions should not impose a financial burden on Richards.

Therefore,

The court ORDERS that respondent cause Richards to appear before the court at 2:00 p.m. on September 24, 2008, so that the court can consider the possibility of ordering the pretrial release of Richards on conditions of release pending the outcome of his retrial.

The court invites the State to recommend to the court conditions of release it believes should be included by the court in the conditions to be fixed by this court, bearing in mind the court's concern that the conditions of release not impose a financial burden on Richards; and, if the State wishes to make such a recommendation, the court ORDERS that it be done by a document filed in this action by 2:00 p.m. on September 23, 2008.

---

1. Even without specific statutory authorization, the court has the inherent power to release a state prisoner on conditions of release pending resolution of his petition for writ of habeas corpus. *See In re Wainwright,* 518 F.2d 173, 174 (5th Cir.1975). Citing *Wainwright* as authority, the Ninth Circuit in *Marino v. Vasquez* explained that "[t]he federal court's authority to release a state prisoner on recognizance or surety in the course of a habeas proceeding derives from the power to issue the writ itself." 812 F.2d 499, 507 (9th Cir.1987). *See also Johnston v. Marsh,* 227 F.2d 528, 531 (3d Cir.1955).